## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOE PETE WELLS and** | : | **Civil No. 3:13-CV-2575** |
| **LES KRUTOFF,** | : | |
| | : | |
| **Plaintiffs** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **v.** | : | |
| | : | |
| **JPC EQUESTRIAN, INC. and** | : | |
| **VARUN SHARMA,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION

## I.   INTRODUCTION AND STATEMENT OF THE CASE[1]

This litigation stems from a broken and embittered commercial relationship between two independent salesman, an equine-products company, and its founder.

The plaintiffs, Joe Pete Wells and Les Krutoff, have sued JPC Equestrian, Inc. ("JPC") and its President, Varun Sharma, alleging that the defendants breached the terms of sales representation contracts by failing to pay the Wells and Krutoff sales commissions for products they sold on behalf of JPC. Additionally, the plaintiffs allege that Sharma tortiously interfered with their contractual relations by causing

---

[1] This case and the parties claims and defenses are substantially related to another action pending before this Court, Mark Edward Kearney v. JPC Equestrian and Varun Sharma, Civil No. 3:11-CV-1419. The resolution of the pending motions in this case substantially parallels our previous disposition of the parties cross motions for summary judgment in Kearney.

another corporate entity that Sharma controlled to engage in sales activity in the plaintiffs' assigned territories, thereby undercutting the commissions that they would have received from JPC.

After the preliminary disposition of a number of claims, the parties engaged in fact discovery, which has now concluded.  Following that discovery, the parties have filed cross motions for summary judgment, which are now ripe for disposition.  For the reasons that follow, we conclude that the plaintiffs' contract claims are replete with disputed issues of fact, and that the resolution of these disputes must await trial. The defendants insist that the record fails to support the plaintiffs' claims that there was mutual assent to support the contracts, or otherwise that the record should compel the conclusion that the plaintiffs waived their contract claims long ago by failing to pursue contractual remedies for years.  We disagree that the record compels such a conclusion, and instead find that the contract claims in this case turn on the resolution of numerous disputed issues in the record, making summary judgment unwarranted.

In contrast, we agree with the defendants that there is insufficient evidence to support the plaintiffs' tortious interference claims, and will enter summary judgment in Sharma's favor on these claims alone.

## II.    FACTUAL BACKGROUND

The background facts relevant to this dispute begin nearly thirteen years ago, and many do not seem to be seriously disputed.

### A.    JPC's Business and Operations

Varun Sharma is a native of India and, since 1992, has operated two businesses in that country.  These businesses manufacture and sell equestrian-related supplies, clothing, and equipment.  Sales from these businesses extend worldwide, and are primarily directed at wholesalers, who then sell the products to retailers.

One of the businesses that Sharma has operated in India is a company called JPC ("JPC-India").  JPC-India is a partnership, in which Sharma owns 90% and his son owns the remaining 10%.  JPC-India primarily sells its products to wholesalers but sometimes sells to retailers as well.  (Doc. 36, Affidavit of Varun Sharma ("Sharma Aff.") ¶¶ 1-5.)

In early 2002, Sharma came to the United States to establish a new business known as JPC Equestrian, Inc ("JPC").  On February 4, 2002, JPC was incorporated under the laws of Pennsylvania.  JPC is a wholly owned subsidiary of Cotton Naturals India Ltd.  Sharma owns 90% of Cotton Naturals, and his son owns the remaining 10%.  Sharma is the President of JPC, which has its principal place of business in Drums, Pennsylvania.  (Sharma Aff. ¶¶ 6-8.)

3

JPC sells equestrian-related supplies, clothing, and equipment to retailers in the United States.  Its purchases inventory from JPC-India and then sells the product to retail-store customers.  (Sharma Aff. ¶ 9.)  Since it was established in the United States in 2002, JPC has used independent sales representatives to make many, but not all, of its sales.  These sales representatives are assigned territories in which they are responsible for marketing and selling JPC product.  (Sharma Aff. ¶ 10.)  In order to market JPC products, sales representatives purchase product samples from JPC and then show those samples to customers.  (Sharma Aff. ¶ 12.)  The sales representatives are all independent contractors, and are paid solely through commissions on sales made to customers.  (Id. ¶ 15.)

Although many of JPC's sales are made through sales representatives, some sales are made through the company's customer service department.  Customers who purchase products through JPC's customer service department are known as "house accounts."  (Id. ¶ 13.)  JPC has used house accounts since 2003.  House accounts are generally internet-based accounts or customers who have asked to deal directly with JPC's customer service department.  (Id. ¶ 14.)

Generally, sales representatives receive 10% sales commissions.  However, because sales to house accounts are made through JPC's customer service department,

4

sales representatives do not receive commissions on these sales. They also do not receive commissions on close-out sales or other liquidation sales. (Id. ¶¶ 16-17.) Sales representatives also receive reduced commissions for bigger, nation-wide customers who are not house accounts, but who consistently buy large quantities of product at a discount. Commission payments for sales to these larger accounts "generally equals" 5% of the sale price. (Id. ¶ 17.)

### B.    The Plaintiffs' Relationship with JPC and Sharma

As Sharma was preparing to enter the equine-products market in the United States, he consulted with a lawyer in New Hampshire, who provided him with a form document that was entitled "Sales Representation Agreement," which the lawyer suggested could be exchanged with the independent sales representatives that Sharma intended to use to market and sell products on behalf of JPC in the United States.

In January 2002, Sharma arranged to meet with the plaintiffs and other sales representatives in the business at a trade show in King of Prussia, Pennsylvania. (Sharma Aff. ¶ 25; Wells Dep. at 46-47; Krutoff Dep. at 29.) Sharma had some familiarity with the plaintiffs due to their involvement in the equine business, specifically as sales representatives for another equestrian-supply wholesaler, English Equestrian Group ("EEG"), and they met during the convention to discuss the possibility of the plaintiffs representing JPC's product line as independent sales

5

representatives.  Sharma recalls have some "general discussions" with the plaintiffs about how the prospective company would operate, what types of products representatives would be expected to sell, and how the representatives would market product and get paid for sales.  (Sharma Aff. ¶ 25; Wells Dep. at 46-47; Krutoff Dep. at 25-31.)  Although no agreements were reached at this meeting, Sharma claims that in April "without discussing any particulars about the company with me, plaintiffs said they would serve JPC Equestrian as independent sales representatives." (Sharma Aff. ¶¶ 25, 27.)

To memorialize this new business relationship, sometime in 2002, after the plaintiffs had begun marketing product on JPC's behalf, Sharma "inserted plaintiffs' respective names and addresses" into the "document template" for a sales representation agreement that Sharma had been provided by the New Hampshire lawyer, entitled "Sales Representation Agreement," which purported to outline the parties' relationship.[2]  None of the parties has produced a copy of the Agreement

---

[2]  Although the defendants now disclaim the term "Agreement" for this document, and use the generic term "Document" to define it in their briefs, we will refer to the document as the "Agreement" in this memorandum.  In doing so, the Court is not signaling that the document is necessarily a binding contract, or that the terms it contains were necessarily terms to which the parties' ultimately agreed; as noted, we find that disputed issues of fact exist as to whether the parties entered into the Agreement, what the terms of their contractual relationship were, if any, and whether JPC breached the terms of such contract.  The term "Agreement" is, however, consistent with the title of the document that Sharma

signed by all parties; instead, Wells has submitted a copy that does not bear his own signature, and Krutoff has not provided a copy of the Agreement that he received and further represents that his copy was not signed by Sharma or anyone else at JPC. (Doc. 1; Wells Dep. at 53; Krutoff Dep. at 40:15-19.)  The plaintiffs testified during their depositions that they considered the Agreement to be a formality, which they even deemed to be "unnecessary," and which was largely "forgotten about."  (Krutoff Dep. at 36:6-12; 39:22-24; 62:2-3; Wells Dep. at 58:20-24.)  It appears that none of the parties engaged in any discussions regarding the terms of the Agreement itself. (Krutoff Dep. at 36:19-23 ("there was no discussion about it.   It was just a formality"); Wells Dep. at 57:19-25; 58:1-5 ("I don't recall discussing it that much at all, really.  I don't recall").)  Although he inserted the plaintiffs' names into the Agreement and sent a copy to each of the plaintiffs, Sharma now claims that "subjectively speaking, I, on behalf of JPC Equestrian, never intended for the purported terms of the Document to govern JPC Equestrian's relationship with the plaintiffs."  (Sharma Aff. ¶ 32.)  Sharma does not explain why, if that was the case, he prepared the Agreement and sent the same to the plaintiffs for their signature.

---

provided to the plaintiffs, and is more descriptive of what the document appears to be.

Although the defendants seem to dispute that Wells and Krutoff ever executed the Agreement, both Wells and Krutoff have testified that they did so. Wells testified as follows:

> I got a call or an e-mail – and I'm not sure which – from Nina DePetris, the vice president, asking had I returned it. And I said, No, I don't even know where the thing is at the moment, Nina. I don't know if it's in one of my briefcases or one of my vehicles. I'll have to find it. She said, Well, we're going to overnight you another copy of it. If you will just sign it and put it in the return mail. I said, I'll do it. And that is was happened.
>
> So therefore, when I finally found this one [i.e., the copy attached to the complaint] in a briefcase I had discarded – not discarded; quit using – I just happened to have it, which meant nothing to me at the time. But I sad, well, I'll just keep it anyhow. So that's how come. There is no reason for this one to be signed, because I never did get around to returning this one. The one that was sent back to them definitely was signed by me and dated.

(Wells Dep. at 52-53.) Krutoff likewise testified that he received a copy of the Agreement, which he signed and returned to the company. (Krutoff Dep. at 35-36.) Nevertheless, in marked contrast, Sharma testified that he never received a signed copy of the Agreement from either of the plaintiffs. (Sharma Aff. ¶¶ 30-31.)

Pursuant to the terms of the Agreement,[3] the plaintiffs agreed to be engaged as sales representatives for JPC as independent contractors.  Wells' Agreement provided that he would act as an independent marketing representative for JPC products, in a defined territory of Maryland, Virginia, North Carolina, and South Carolina.  Krutoff represents that pursuant to the Agreement that he received, he would serve as a marketing representative in Pennsylvania, New York, New Jersey, and Delaware.

The plaintiffs also claim that they had substantive discussions with Sharma about the terms of their Agreements and relationship with JPC, and the plaintiffs' version of these discussions differed markedly from that recalled by Sharma.  Thus, Wells testified during his deposition that Sharma assured him that he would be paid a 10% commission on all sales made within his territory, and that Sharma agreed to furnish Wells with samples at no charge to enable him to "get right out and go" begin marketing and selling on JPC's behalf.  (Wells Dep. at 47-48.)  Krutoff similarly testified that he made it clear to Sharma that he wanted a 10% commission on all sales

---

[3] It appears to be undisputed that Sharma prepared and sent sales representative agreements to both Wells and Krutoff, although only Wells's copy has been produced by the parties. (Compl., Ex.)  There is no suggestion in the record that the terms of the Agreement provided to Krutoff differed any respect from that provided to Wells, other than with respect to assigned sales territories, and since Sharma has taken the position that he treated the document as a mere form, there appears to be no reason to believe that the terms of the document provided to either plaintiff differed in any other material respect.

within his territory, which was exclusive, and that there would be no house accounts on which commissions would not be paid.  (Krutoff Dep. at 33.)   The 10% commission the plaintiffs claim Sharma agreed to orally is similarly reflected in the Agreement that Sharma prepared and provided to the plaintiffs in 2002. (Doc. 1, Compl., Ex.)

The terms of the Agreement provide, apparently with no exceptions, that the plaintiffs would be paid a 10% commission on the total net payable invoices on sales made by the company and which resulted "from the Sales Representative's Introductions or other interventions."  (Doc. 1, Compl., Ex., Sales Representation Agreement ¶ 4.)   The Agreement also provided that the plaintiffs would bear their own expenses, with certain exceptions, and prohibited them from working for competitors while serving as JPC's representative.  The Agreement also spelled out the procedures and timing by which either party could terminate the Agreement.

The defendants insist that the "Sales Representation Agreement" that Sharma prepared and provided to each of the plaintiffs does not amount to a contract.  To the contrary, the defendants emphasize that the "Agreement" was never negotiated by the parties.  They also assert that the plaintiffs failed to sign and return the document, or that neither JPC nor Sharma executed the document, and they highlight numerous instances where the parties did not faithfully follow each and every provision of the

Agreement over the course of their years of commercial dealings with one another (something the plaintiffs acknowledge, but argue actually supports their claims that the defendants repeatedly breached the parties' agreement).

The plaintiffs claim that although they were typically paid the 10% commission called for under the Agreement, at numerous times JPC failed to pay a 10% percent commission on certain accounts, and instead paid only 5% for these accounts – something that Sharma has attested was the standard practice for JPC.  Later, the plaintiffs claim that JPC converted some large accounts to "house accounts" and thus paid them no commissions at all on sales made to these accounts even if they were within the plaintiffs' sales territories.  The plaintiffs also alleges that JPC sold directly to a number of their customers in order to avoid paying a commission as required under the Agreement.  Finally, the plaintiffs allege that Sharma tortiously interfered with their contracts with JPC by selling products on behalf of JPC-India, in direct competition with JPC, and, therefore, denied the plaintiffs the benefit of their contracts with JPC by interfering with their sales efforts, and impairing their ability to earn commissions on the sales they generated.

JPC and Sharma take a decidedly different, and far narrower, view of the parties' relationship.  Although they never explain or define the precise nature of the commercial relationship that JPC and the plaintiffs had for approximately eight years,

or whether that relationship was governed by any written or oral contractual agreement, they are adamant that the "Sales Representation Agreement" first tendered from Varun Sharma to the plaintiffs in or around May 2002 did not form a contract. In support of this assertion, the defendants contend that the plaintiffs never signed the Agreement, despite being asked to do so by Sharma, or otherwise that no copy of a fully executed agreement have been produced.  In the absence of a copy of the "Agreement" bearing all parties' signatures, the defendants insist the document never matured into an enforceable contract.

The defendants also note that the "Agreement" was not negotiated by the parties, emphasize that the plaintiffs testified during their depositions that the Agreement was essentially a formality and something that the parties did not focus on, and more importantly, the defendants maintain that the parties did not act consistently with numerous terms of the Agreement.  Despite undisputed evidence showing that the parties adhered to many of the terms of the Agreement, the defendants insist that the parties paid so little regard to certain other terms that it compels a finding that the parties never manifested their assent to the Agreement.

Furthermore, the defendants argue that even if there were factual disputes regarding whether the parties entered in to the Agreement, they submit that summary judgment is nevertheless warranted because the plaintiffs have waived their right to

12

enforce the Agreement's terms.  Here the defendants are saying that because the plaintiffs continued working even while they were being paid less than full commissions on their sales, and while JPC was not adhering to all terms of the Agreement, their passivity should be construed as a waiver of their right now to enforce the terms of the parties' arrangement.

Finally, the defendants argue that they are entitled to summary judgment on the plaintiffs' claims that Sharma tortiously interfered with their contractual relations with JPC.  The defendants assert that the plaintiffs have no evidence to show that Sharma caused JPC to breach any contract that it had with the plaintiffs, and there is no evidence showing that Sharma as a third party interfered with a contract that the plaintiffs may have had with JPC.  Kearney, in contrast, argues that his claim is straightforward:  JPC India sells bulk goods of the same type as those sold by JPC in smaller quantities, and in numerous instances Sharma, acting as managing director of JPC India, interfered with the plaintiffs' contracts with JPC by selling goods in direct competition with JPC, and, therefore, denying the plaintiffs the benefit of their own contracts with JPC.

Thus, despite agreeing on many of the facts in this case, the parties take sharply different views of the claims and the factual record, and those sharply divergent views are reflected in competing evidence in the record that makes summary judgment in

favor of either party on the plaintiffs' breach-of-contract claim inappropriate at this time.

Although it is difficult to embrace the defendants' assertion that the parties operated for eight years in a commercial relationship without any contractual arrangement, and although many of the defendants' interpretive arguments seem rather narrow, we nonetheless find that there do remain sufficient questions as to whether and when the plaintiffs and JPC entered into an enforceable contract, and if so what the terms of that contract were, and whether those terms were breached.

In contrast, we find that the plaintiffs' tortious interference claim against Varun Sharma lacks sufficient evidentiary support, and is undermined by Sharma's sworn explanation regarding the nature of JPC-India's sales to customers in the plaintiffs' sales territories.  Furthermore, we do not find in the record sufficient evidence to show that Sharma effectively could be considered a third-party interferer, since he effectively controlled both JPC and JPC India.

Accordingly, for the reasons that follow, the parties' cross-motions for summary judgment will be denied with respect to the plaintiffs' breach-of-contract claims, and granted in favor of Varun Sharma with respect only to the tortious-interference claims.

## III.   STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

> A party may move for summary judgment, identifying each
> claim or defense – or the part of each claim or defense – on
> which summary judgment is sought.  The court shall grant
> summary judgment if the movant shows that there is no
> genuine dispute as to any material fact and the movant is
> entitled to judgment as a matter of law.  The court should
> state on the record the reasons for granting or denying the
> motion.

Fed. R. Civ. P. 56(a).  For purposes of Rule 56, a fact is material if proof of its

existence of nonexistence might affect the outcome of the suit under the applicable

substantive law.  Haybarger v. Laurence Cnty. Adult Prob. & Parole, 667 F.3d 408,

412 (3d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986)).  For an issue to be genuine, "all that is required is that sufficient evidence

supporting the claimed factual dispute be shown to require a jury or judge to resolve

the parties' differing versions of the truth at trial."  Id. (quoting Anderson, 477 U.S.

at 248-49).

Accordingly, in support of a motion for summary judgment, the moving party

must show that if the evidence of record were reduced to admissible evidence in

court, it would be insufficient to allow the non-moving party to carry its burden of

proof.  See Celotex v. Catrett, 477 U.S. 317, 323 (1986).  Provided the moving party

has satisfied this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).  Instead, if the moving party has carried its burden, the non-moving party must then respond by identifying specific facts, supported by evidence, which show a genuine issue for trial, and may not rely upon the allegations or denials of its pleadings.  <u>See</u> Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007); <u>see also</u> Fed. R. Civ. P. 56(c).

In adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, <u>Anderson</u>, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true.  <u>Id.</u>  Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  <u>Id.</u> at 252; <u>see also</u> <u>Big Apple BMW</u>, 974 F.2d at 1363.  In reaching this determination, the Third Circuit has instructed that:

16

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

When a court is presented with cross-motions for summary judgment, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." See Schlegel v. Life Ins. Co. of N. America, 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (1998)); see also Marciniak v. Prudential Financial Ins. Co. of Am., 184 F. App'x 266, 270 (3d Cir. 2006).

17

## IV.   **DISCUSSION**

### A.   **Disputed Issues of Fact Remain with Respect to the Plaintiffs' Breach of Contract Claim.**

"Where the facts are in dispute, the question of whether a contract was formed is for the jury to decide." Ingrassia Construction Co. v. Walsh, 486 A.2d 478, 482 (Pa. Super. Ct. 1984) (quoting O'Neill v. ARA Services, Inc., 457 F. Supp. 182, 185 (E.D. Pa. 1978)).

Mindful of this overarching principle of contract law and the proper respective roles of the court and the jury, we first consider the defendants' assertion that the Agreement never formed a contractual relationship between either of the plaintiffs and JPC.  The Agreement provides that it was to be interpreted in accordance with Pennsylvania law, and the parties have at all times indicated that they mutually believe that Pennsylvania law governs the claims in this case.  The defendants argue that the plaintiffs' failure to sign the document, or perhaps Sharma's failure to sign the document, caused it to be entirely unenforceable, and they argue that the parties' subsequent conduct, and indeed the plaintiffs' own testimony about how they viewed the written Agreement, compels a finding that neither the plaintiffs nor JPC considered themselves to be bound by the Agreement's terms.

As a threshold matter, as the parties prosecuting a claim for breach of contract, the plaintiffs bear the burden of proving the following:  (1) the existence of a contract; (2) a breach of duty imposed by the contract; and (3) resultant damages. Pennsy Supply, Inc. v. Am. Ash. Recycling Corp., 895 A.2d 595, 600 (Pa. Super. Ct. 2006).  Pennsylvania law holds that a contract is enforceable "when the parties to it 1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity."  Helpin v. Trustees of the Univ. of Pa., 969 A.2d 601, 610 (Pa. Super. Ct. 2009) (quoting Weavertown Transport Leasing, Inc. v. Moran, 834 A.2d 1169, 1172 (Pa. Super. Ct. 2003)).

"The law of this Commonwealth makes clear that a contract is created where there is mutual assent to the terms of a contract by the parties with the capacity to contract."  Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Bd., 739 A.2d 133, 136 (Pa. 1999).  Notably, "[a] true and actual meeting of the minds is not necessary to form a contract.  In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter."  Ingrassia Constr. Co., 486 A.2d at 482-83 (citations omitted).[4]  Furthermore, "[i]f the parties agree upon essential

---

[4] As one treatise explains:

According to the objective theory of contract formation,

19

terms and intend them to be binding, a contract is formed even though they intend to adopt a formal document with additional terms at a later date." Hartman v. Baker, 766 A.2d 347, 351 (Pa. Super. Ct. 2000) (citation omitted). Moreover, "[a]s a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties." Id. (quoting Shovel Transfer and Storage, 739 A.2d at 136). Additionally, "an offer may be accepted by conduct and what the parties d[o] pursuant to th[e] offer is germane to show whether the offer is accepted." Id. (quoting Schreiber v. Olan Mills, 627 A.2d 806, 808 (Pa. Super. Ct. 1993)).

Under Pennsylvania law, courts determining whether the parties objectively manifested their intention to be bound will consider the entire document asserted to represent the parties' contractual agreement, and assess the relevant circumstances

---

what is essential is not assent, but rather what the person to whom a manifestation is made is justified as regarding as assent. Thus, if an offeree, in ignorance of the terms of an offer, so acts or expresses itself as to justify the other party in inferring assent, and this action or expression was of such a character that a reasonable person in the position of the offeree should have known it was calculated to lead the offeror to believe that the offer had been accepted, a contract will be formed in spite of the offeree's ignorance of the terms of the offer.

1 Richard A. Lord, Williston on Contracts § 4:19 (4th ed. 2008) (quoted in Morales v. Sun Constructors, Inc., 541 F.3d 218, 222 (3d Cir. 2008)).

that surround the document's creation, including the parties' conduct.  See Channel Home Centers v. Grossman, 795 F.2d 291 (3d Cir. 1986) (vacating and reversing the district court's determination that there was no enforceable agreement based upon a property owner's promises to a prospective tenant).  Guided by these bedrock principles of Pennsylvania contract law, we turn to the defendants' contention that the Agreement that Sharma filled out, signed, and provided to the plaintiffs did not actually constitute a binding contract.

As an initial matter, the defendants place undue weight on the fact that neither party has produced copies of the Agreement that bears all parties' signatures.  It is undisputed that Sharma prepared the document, and that he sent the document to each of the plaintiffs with a request that they sign it.  It is undisputed that no copy of the Agreement has been produced with the signatures of all parties.  Relying on standard language contained in the Agreement that provides that it "may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument," (Doc. 1-1), and a single unpublished decision narrowly construing this language as creating an ironclad requirement that such an agreement be signed by both parties to be enforceable, the defendants argue that the absence of all parties' signatures renders the entire

Agreement unenforceable as a matter of law. We disagree that this matter can be resolved at summary judgment.

A document signed by only one party may be enforceable "as long as both parties accept and act under its terms." Sullivan v. Allegheny Ford Truck Sales, Inc., 423 A.2d 1292, 1295 (Pa. Super. Ct. 1980).  Although the defendants acknowledge this principle of contract law, they nonetheless argue that in this case the absence of a fully signed agreement compels a finding that the Agreement never matured into a binding contract.  The defendants' support this assertion by relying exclusively on Buzzmarketing, LLC v. The Upper Deck Company, LLC, No. Civ. A. 03-4392, 2004 WL 966241 (E.D. Pa. May 6, 2004), an unpublished decision in which the court considered the question of whether parties who orally agreed to the terms of an unsigned written contract were bound by the terms of the writing.

In Buzzmarketing, the court noted that the Pennsylvania Supreme Court has held that the mere fact that a proposed contract contained signature lines is not conclusive evidence that the parties intended to require the contract to be executed only in writing, but also held that if the contract had contained language "stating the parties' intent to execute the agreement in writing, the oral agreement would indeed have been invalid."  Id. (citing Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd., 739 A.3d 133, 138 (Pa. 1999).  In Shovel Transfer the court

found the absence of such intentional language in the written agreement would be construed against the drafting party, and held that the inclusion of signature lines alone was insufficient proof of the parties' intent that the agreement needed to be executed in writing to be binding. Accordingly, the Shovel Transfer court found that the parties' oral agreement to the terms of a written, but unsigned, contract were enforceable. Id.

In contrast, the Buzzmarketing court cited to a decision of the Pennsylvania Commonwealth Court which held that a proposed contractual clause that provided that the contract in question would "not be fully executed and binding on the Parties unless and until all signatures are affixed hereto" manifested the parties' intent to execute the contract only in writing. Id. (citing Commonwealth v. On-Point Technology Sys., Inc., 821 A.2d 641, 648, 649 n.13 (Pa. Commonw. Ct. 2003). The inclusion of such mandatory language satisfied the holding of Shovel Transfer that a contract will not be enforceable if both parties expressly agreed that full execution of the agreement by both parties was a condition to enforcement.

Relying on the foregoing cases, the Buzzmarketing court turned to the language of the unsigned written agreement at issue in that case. That language provided only that "[t]his Agreement *may* be executed in counterparts and facsimile signatures shall suffice as originals." Buzzmarketing, LLC, 2004 WL 966241, at *3 (emphasis

23

added).   Although this boilerplate language contained none of the mandatory language at issue in On-Point Technology that the Commonwealth Court found manifested the parties' intent to enter into only a fully-executed written agreement, the court nevertheless concluded that the clause "signatures shall suffice" to execute the agreement "clearly indicate[d] the parties' intent to execute the agreement only by signing it." Id.

Upon consideration, we do not find the Buzzmarketing court's analysis of this issue to be persuasive, and we do not agree with the defendants that the holding in On-Point Technology adequately supports the court's conclusion.   Whereas the contractual language at issue in On-Point Technology plainly stated that the contract would "not be fully executed and binding on the Parties unless and until all signatures are affixed hereto," the language in the document in Buzzmarketing merely allowed for the parties to execute the document in counterpart and by facsimile; it did not contain anything comparable to the mandatory language used by the parties in On-Point Technology.   For that reason, we do not agree with the court's assessment that "it is difficult to conceive of any reasonable reading of this term under which the agreement could be executed without the signatures of both parties." Id.

Since the language used in the Agreement did not expressly make clear that it could only become effective upon the signature of both parties, and because the

language regarding counterparts and facsimile signatures are familiar and typical clauses used in commercial contracts generally, we do not agree that use of this customary language causes all agreements bearing this language to become unenforceable in the absence of signatures.

Our interpretation of the language at issue, and the teaching of Shovel Transfer, is bolstered by the fact that Pennsylvania has long recognized that a document signed by only one party may be enforceable "as long as both parties accept and act under its terms." Sullivan v. Allegheny Ford Truck Sales, Inc., 423 A.2d 1292, 1295 (Pa. Super. Ct. 1980). The decisions in Shovel Transfer and On-Point Technology do not fundamentally change that principle; instead those cases simply recognize that parties can agree with one another that any written agreement they are negotiating will not become binding unless and until both parties sign the document. Accordingly, we do not find that the typical, even boilerplate, language used in the Agreement regarding the manner of signature rendered the contract entirely unenforceable in the absence of both parties' signatures. The plaintiffs have attested that they signed the Agreement that Sharma provided to them, and the absence of a copy of the Agreement bearing all parties' signatures is not dispositive as to whether the parties entered into a binding contract.

### B.     Neither Party is Entitled to Summary Judgment Based Upon Pre-Contracting or Post-Contracting Conduct

Next, the defendants argue that the Agreement should be declared unenforceable because "[t]he relevant circumstances surrounding the Document's creation and the parties' behavior afterward also show that the parties never intended to be bound by the Document." (Doc. 37, at 20.)  In particular, the defendants argue that the plaintiffs and Sharma did not actively negotiate the terms of the Agreement, and that after the Agreement was exchanged the parties acted in a manner that was inconsistent with some of the Agreement's terms.  The defendants also place great weight on select testimony by the plaintiffs to the effect that Wells considered that the Agreement was "unnecessary," (Wells Dep. at 58:20-24), that Krutoff considered it a mere "formality," (Krutoff Dep. at 36:6-12), and that the parties had few, if any discussions about it.  In making these arguments, however, the defendants are really arguing about how the facts should be interpreted, and they do not persuade us that those facts compel the entry of summary judgment in their favor on the question of whether the parties entered into a valid and binding contract in 2002.

In addition to arguing that the parties' pre-contracting conduct suggests that the parties were not in mutual agreement, the defendants set forth numerous instances where the parties behaved contrary to, or inconsistently with, the terms of the

Agreement.  Thus, for example, the defendants note that although the Agreement provided that the plaintiffs would "meet reasonable gross sales requirements that are assigned . . . by the Company," (Agreement ¶ 1(b)), it is undisputed that JPC never established or imposed sales requirements on the plaintiffs.  (Wells Dep. at 60:10-12; Krutoff Dep. at 43:21-24; 44:1 - 45:2; Sharma Aff. ¶ 33(a).)  The defendants also note that paragraph 1(d) of the Agreement purports to require Kearney, as the sales representative, to collect payments from customers, but this was never done.  (Wells Dep. at 61:5-15; Krutoff Dep. at 45:16-21; Sharma Aff. ¶ 33(b).)  Likewise, the Agreement prohibits a sales representative from selling products that compete with JPC's products, but there is evidence to show that Krutoff did, and that Wells may have, sold products that competed with JPC during the time they worked on JPC's behalf, but JPC did not invoke the non-compete provision to force either plaintiff to discontinue their outside sales work.  (Wells Dep. at 40-41; Krutoff Dep. at 21-22; Sharma Aff. ¶ 33(c).)

The Agreement further provided that the sales representative would receive a 10% commission on sales "directly resulting from the Sales Representative's introductions or other interventions."  (Agreement ¶ 4.)  It is undisputed that on multiple occasions, the plaintiffs were not paid a 10% commission on close-out sales, house accounts, or sales made to larger, national account customers, and these

practices existed over the course of the parties' eight-year relationship. For their part, the defendants argue that JPC's routine practice of paying less than 10% commissions depending upon the particular customer and circumstances shows that the parties did not intend to be bound by the single 10% commission provided for in the Agreement. The plaintiffs have maintained that their agreements provided that they would be paid 10% and the fact that they were not paid such commissions on all sales is evidence not of a waiver, but of a breach. We believe that the parties' divergent interpretation of these facts highlight a material factual dispute, and does not compel the entry of judgment for either party as a matter of law.

The defendants submit numerous other instances where they claim the parties disregarded the Agreement's terms, or did not faithfully comply with them. The defendants aggregate instances where the parties did not strictly comply with the Agreement's provisions and terms, and argue that the conduct of the parties suggests a complete absence of outward and objective manifestations of assent to the terms of the Agreement. Again, the plaintiffs insist that whether or not all terms of the Agreement were followed is not dispositive of whether a binding contract was formed, and emphasize their view that instances of what they perceive as breach should not be construed instead as a waiver on their part of their right to enforce the terms that they claimed they bargained for.

28

On the record before the Court, we find that summary judgment in favor of either party is inappropriate on the question of whether the parties entered into a binding Agreement and, if so, what the scope of its terms were, and we do not find that these questions may be answered as a matter of law by this Court based purely upon examples of the parties' conduct over a lengthy commercial relationship. The defendants' collection of instances where the parties diverged from the precise terms of the Agreement are not sufficient to show that there was a complete absence of outward and objective manifestations of assent, since it is also undisputed that Sharma prepared and provided the Agreement to the plaintiffs, that the plaintiffs continued selling on behalf of JPC immediately after being provided the Agreement that Sharma himself prepared, and in many respects the parties seem to have followed fundamentally material aspects of the Agreement. Furthermore, the plaintiffs argue that Sharma required all sales representatives to have signed contracts, and that he maintained a file with these contracts at JPC's headquarters in Drums, Pennsylvania, thus suggesting that is was common practice for JPC to enter into agreements with its independent sales force. The record concerning whether the parties entered into a written contract, or otherwise entered into an enforceable oral agreement, is in dispute, and is not capable of being resolved through a motion for summary judgment.

**C.   The Defendants are Not Entitled to Summary Judgment on Their Affirmative Defense that the Plaintiffs Waived Their Rights Under the Agreement**

The defendants argue that even if the Court finds that disputed issues of fact preclude summary judgment as to whether the parties entered into an enforceable contract, the Court should nevertheless grant summary judgment because the plaintiffs waived their right to enforce the Agreement as a matter of law.  Here, too, we disagree.

"A waiver is the intentional relinquishment of a known right."  Consol. Rail Corp. v. Delaware & H. R. Co., 569 F. Supp. 26, 29 (E.D. Pa. 1983); Brown v. Pittsburgh, 186 A.2d 399, 401 (Pa. 1962).   Under Pennsylvania law, parties may waive contract provisions.  Trumpp v. Trumpp, 505 A.2d 601, 603 (Pa. Super. Ct. 1985).  "To constitute a waiver of a legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it."  Brown, 186 A.2d at 401.  Waivers may be express or implied.  Id.  In this case, the defendants argue that the plaintiffs impliedly waived their right to enforce the terms of the Agreement governing payment of commissions, and the provision of samples.

An implied waiver exists where:  (1) there is an "unexpressed intention to waive, which may be clearly inferred from the circumstances"; or (2) when there is

no such actual intention to waive, but where a party's conduct "misleads [the other contracting part] into a reasonable belief" that a contract provision no longer matters. Den-Tal-Ez, Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1223 (Pa. Super. Ct. 1989) (applying New York law).  However, "[i]t is well settled under Pennsylvania law that the doctrine of implied waiver 'applies only to situations involving circumstances equivalent to an estoppel, and the person claiming the waiver to prevail must show *that he was misled and prejudiced thereby*.'"  Consol. Rail Corp. v. Delaware & H. R. Co., 569 F. Supp. 26, 29-30 (E.D. Pa. 1983) (emphasis in original). "In other words, applying the same standards as used in claims of estoppel, the moving party must show that it was prejudiced because the promise caused it to change its position." 2101 Allegheny Assocs. by Rappaport v. Cox Home Video, Inc., Civ. A. No. 91-2743, 1991 WL 225008, at *9 (E.D. Pa. Oct. 29, 1991).  The party asserting waiver as a defense has the burden of proving that the counterparty impliedly waived its right to enforce a contractual provision. Id.; United States ex rel. E.C. Ernst, Inc. v. Curtis T. Bedwell & Sons, Inc., 506 F. Supp. 1324, 1329 (E.D. Pa. 1981).

The defendants argue that the plaintiffs' failure to seek legal enforcement of their rights under the Agreement over eight years should now be construed as a matter of law to constitute waiver of those claims.  The defendants have not carried their

burden in this regard, in large part because other than to cite to cases in which waiver has been found, they have not demonstrated that in their case they were actually misled by the plaintiffs' conduct, or that they were actually prejudiced by the plaintiffs' decision not to enforce their alleged rights under the Agreement.  Since the defendants have not demonstrated that they were somehow misled by the plaintiffs, or that they are now unreasonably prejudiced by their claims of breach, we cannot agree that a jury would be compelled to find in their favor on this affirmative defense.[5]

Although we do not find that the defendants are entirely foreclosed from pursuing their affirmative defense of waiver at trial, they are not entitled to summary judgment on the basis of the defense.

In summary, we find that there remain disputed issues of material fact with respect to whether the parties had entered into an enforceable sales representation

---

[5]  Moreover, the defendants offer especially thin legal support for their argument regarding waiver.  The defendants essentially rely on a single bankruptcy court decision in which a party's failure to enforce a warranty to repair a medical device lulled the defendant into believing that its services were acceptable.  In re Imaging Services, 143 B.R. 355, 359 (Bankr. W.D. Pa. 1992).  The defendants in this case do not persuasively analogize the performance guarantee at issue in In re Imaging Services to the sales representation agreement that is the subject of this case, or how Kearney's alleged decision to continue working despite the defendants' alleged breaches of the parties' agreement is analogous to the failure to exercise rights under a service warranty.

contract; about whether the defendants breached that contract; about which terms of that contract, if any, may have been breached; and about whether the plaintiffs may have waived their rights to enforce any aspect of that Agreement by waiting to bring suit until 2010.[6]

**D.   Sharma is Entitled to Summary Judgment on the Plaintiffs' Tortious Interference Claim**

The plaintiffs also claim that Varun Sharma tortiously interfered with their rights under the Agreement, and undercut their ability to earn commissions under the Agreement, by funneling sales in the plaintiffs' territories from JPC to JPC-India. Thus, the plaintiffs allege that Sharma sold products on behalf of JPC-India, and these products were precisely the same type and nature sold by JPC in smaller quantities.

Pennsylvania law has adopted the Restatement (Second) of Torts § 766, governing the tort of malicious interference with contract. Adler, Barish, Daniels, Levin and Creskoff v. Epstein, 393 A.2d 1175 (Pa. 1979); see also Daniel Adams

---

[6] The defendants also urge the Court at this time to enter an order limiting the plaintiffs' claim for damages based upon Pennsylvania's four-year statute of limitations governing contract claims. 42 Pa. Cons. Stat. Ann. § 5525(a)(1). Although the Court recognizes the statute-of-limitations in this case, we find it unnecessary to separately rule in this opinion regarding the scope of damages that may be recoverable, since such a matter may effectively be addressed with the parties separately prior to trial or, if necessary, through instructions at the time of trial.

Assocs., Inc. v. Rimbach Pub., Inc., 519 A.2d 997, 1000 (Pa. Super. Ct. 1987).

Section 766 explains the tort as follows:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766.

To maintain a claim for tortious interference, the plaintiffs bear the burden of demonstrating: (1) the existence of a contractual, or prospective contractual relationship between the plaintiff and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relationship, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) actual legal damages resulting from the defendant's conduct. CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc., 357 F.3d 375, 384 (3d Cir. 2004). The plaintiffs have not come forward with sufficient evidence to allow this claim to move beyond summary judgment.

The plaintiffs claim that Sharma, acting on behalf of JPC-India, interfered with the Agreement between the plaintiffs and JPC by acting on behalf of JPC-India to divert sales from JPC to JPC-India, thereby depriving the plaintiffs of sales

commissions. Yet, the plaintiffs never point to evidence showing that Sharma, acting on behalf of another corporate entity that he also controlled, intentionally interfered with an actual contractual relationship that the plaintiffs and JPC had. Even assuming that the Agreement constituted an enforceable contract, the plaintiffs do not explain, or point to evidence showing, that Sharma interfered with that contract by negotiating sales on behalf of JPC-India that may arguably have impacted the plaintiffs' ability to earn commissions. They simply assert that Sharma undermined their ability to earn commissions by selling products through JPC-India rather than through JPC. This is insufficient.

Furthermore, we have difficulty perceiving how the plaintiffs can satisfy the first prong necessary to a tortious interference claim, namely, that Sharma was a third-party interferer for purposes of the tort. It is fundamental that in order to recover for tortious interference, a plaintiff must demonstrate the existence of a contractual relationship between himself and a third person "other than the defendant." Daniel Adams Assocs., 519 A.2d at 1000. In other words, the party against whom the tort is asserted cannot be the other party to the plaintiffs' contract, but instead must be a third party outside of the parties' contractual relationship. Nix v. Temple Univ., 596 A.2d 1132, 1137 (Pa. Super. Ct. 1991) (a corporate agent acting on behalf of a corporation is not a party distinct from the corporate entity and thus is not subject to

tortious-interference liability).  In this case, the defendants have persuasively shown that Sharma owns and operates both JPC and JPC India, the party that the plaintiffs seem to claim interfered with their own contracts with JPC.  Sharma thus maintains that as a practical matter, given his ownership interests in JPC and JPC India, he and these twin entities are effectively the same, and thus he argues that he cannot practically interfere with a contract to which he is a party.  The plaintiffs do not persuasively respond to this assertion, and they do not produce evidence to support their claim in any event that Sharma tortiously interfered with their contract with JPC. Sharma is thus entitled to summary judgment on this claim.

## V.    **CONCLUSION**

Accordingly, for the foregoing reasons, the plaintiff's motion for partial summary judgment will be denied, and the defendants' motion for summary judgment will be granted with respect to the plaintiffs' tortious interference claim only, and will be denied in all other respects.

An order consistent with this memorandum shall issue separately.


*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

36